# **EXHIBIT A**

AMENDED COMPLAINT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**Charles Kenyatta Jr., aka Charlie Cee**
Plaintiff,

v.

**Sean Combs, aka "Diddy," aka "P. Diddy," and Bad Boy Entertainment**
Defendants.

---

Case No. **1:24-cv-06923-JGK-GS**

**AMENDED COMPLAINT**

Plaintiff, **Charles Kenyatta Jr. aka Charlie Cee**, appearing pro se, files this Amended Complaint against Defendants **Sean Combs** and **Bad Boy Entertainment LLC (BBE)**, and alleges as follows:

---

**PARTIES**

1. Plaintiff, **Charles Kenyatta Jr.**, is the registered owner of the trademarks "ACT BAD" and "ACT BAD ENTERTAINMENT," both registered with the United States Patent and Trademark Office (USPTO). Plaintiff's trademarks are essential to his business operations, marketing, and brand identity. Plaintiff is currently incarcerated at Collins Correctional Facility.

2. Defendant **Sean Combs** is an individual and owner of **Bad Boy Entertainment LLC**, who engaged in unauthorized use of Plaintiff's trademarks.

3. Defendant **Bad Boy Entertainment LLC (BBE)** is a corporate entity with its principal place of business in New York, directly involved in the promotion, marketing, and sale of goods and services associated with the infringing use of Plaintiff's trademarks.

---

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121, as this action arises under the Lanham Act for trademark infringement, unfair competition, and related claims. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district.

---

**FACTUAL BACKGROUND**

**Plaintiff's Trademark Ownership and Use in Commerce**

5.  Plaintiff is the sole owner of the registered trademarks "ACT BAD" (Registration No. 9713866) and "ACT BAD ENTERTAINMENT" (Registration No. 97034267). Both trademarks are registered with the USPTO and cover categories including clothing, entertainment services, and related commercial activities.

**6.**  Plaintiff's trademarks have been used in commerce since at least [Insert Year] in connection with the sale of clothing, branded merchandise, and entertainment-related promotions.

**Unauthorized Use by Defendants**

7.  Plaintiff, Charles Kenyatta Jr., was presented with a contract by Defendants Bad Boy Entertainment LLC and Sean Combs ("Defendants") in connection with Plaintiff's trademark, *Act Bad*. The contract was sent on June 1, 2023, by Defendants' attorney, Pamela Gurley wrote on June 1st, 2023 at 2:10 pm , to Plaintiff's entertainment lawyer, Andrew Covington, "Hi Andrew we are outside counsel for Bad Boy we understand that your client will be participating on the record "Act Bad."  The contract outlined proposed terms for Defendants to use the *Act Bad* trademark, including a percentage of net profits from a recorded song titled "Act Bad," a music video, and merchandise sales such as t-shirts and hats.

8.  Plaintiff's attorney, Andrew Covington, engaged in correspondence with Defendants' attorney, Pamela Gurley. During these discussions, Ms. Gurley explicitly confirmed that the contract terms were agreed upon by both parties. However, after initial communications, Ms. Gurley ceased responding to emails from Plaintiff's attorney, leaving unresolved key issues that prevented execution of the contract. Plaintiff has preserved these email communications, which demonstrate the Defendants' acknowledgment of Plaintiff's ownership of the *Act Bad* trademark and the parties' initial agreement. (See Exhibit B & C).

9.  Plaintiff, who was incarcerated at the time, did not sign the contract, nor did his Power of Attorney. Plaintiff's attorney raised concerns about the contract, including the absence of an upfront payment and provisions unfavorable to Plaintiff.

10. Despite the lack of a signed agreement, Defendants proceeded to use Plaintiff's trademarks in commerce, including:

    o  Promotion and sale of merchandise bearing the "ACT BAD" mark.

    o  Public performances and promotion of the song "ACT BAD."

    o  Social media campaigns and interviews featuring the "ACT BAD" brand**.**

    o  Sale of "ACT BAD" t-shirts on Sean Combs' official website, which sold out, demonstrating substantial use in commerce and consumer demand directly tied to Plaintiff's trademarks.

11. Defendant Sean Combs actively promoted the phrase "Act Bad" through interviews, features in prominent magazines, and other media appearances, creating the false impression that "Act Bad" is his brand. These public statements led to widespread consumer and industry confusion, as individuals mistakenly associated the "Act Bad" brand with Sean Combs, further diluting the value and goodwill of Plaintiff's trademarks.

12. Defendant's release of the song "Act Bad" generated substantial revenue through streaming platforms which had 5.6 million views on youtube, sales, and public performances, all of which amplified the unauthorized use of Plaintiff's trademarks. The song has been streamed hundreds of thousands and also millions of times across major platforms, including Spotify, Apple Music, and YouTube, and was performed publicly on multiple occasions, misleading the public regarding the ownership of the "Act Bad" brand. (See Exhibit 12)

13. Defendant Sean Combs' use of the *Act Bad* trademark caused significant confusion among consumers and the public regarding the affiliation, connection, or association between Plaintiff and Defendants. Notably:
    o Defendant Sean Combs made social media posts promoting the "Act Bad" record, including one in which he referenced Plaintiff's stage name and social media handle, stating, "Shout out to Mr. Act Bad @charliecee." (See Exhibit 7)
    o Defendant Sean Combs publicly displayed and sold *Act Bad*-branded merchandise, including t-shirts and hats, without Plaintiff's authorization.
    o Defendant Sean Combs set his social media profile picture to the phrase "ACTBAD," included "Act Bad" in his bio, and used numerous hashtags referencing *Act Bad* to promote the record and merchandise. (See Exhibit 6)

14. Defendant Sean Combs knowingly and in bad faith marketed, distributed, and sold products bearing the *Act Bad* trademark in the United States without Plaintiff's permission. These unauthorized activities involved materially different products that caused confusion among consumers regarding their source and authenticity, further infringing on Plaintiff's trademark rights.

15. Under trademark law, a written contract must be signed by both parties to be legally enforceable. However, even when unsigned, a written contract may still be valid if the parties demonstrate mutual assent through their actions or communications. Here, Defendants' acknowledgment of Plaintiff's ownership of *Act Bad* and the ongoing correspondence between counsel confirm the enforceability of Plaintiff's rights under the law. (See Exhibit 1-3)

**Consumer Confusion and Reputational Harm**

16. Defendants' unauthorized use of the "ACT BAD" trademarks has caused widespread public confusion. Consumers have contacted Plaintiff under the mistaken belief that Sean Combs owns or is affiliated with the "ACT BAD" brand. Evidence of this confusion includes:

• Magazine articles and promotional materials associating "ACT BAD" with Sean Combs.

17. The association of the "ACT BAD" trademarks with Sean Combs has caused significant reputational harm to Plaintiff due to the negative publicity surrounding Sean Combs' legal

controversies, including allegations of sexual misconduct in the highly publicized case involving Cassie Ventura. The controversy has devalued Plaintiff's brand and deterred consumers and business partners from engaging with the "ACT BAD" name.

**Impact on Plaintiff While Incarcerated**

18. Since Defendant Sean Combs' legal controversies have been publicized, Plaintiff has endured severe harassment and defamatory treatment by prison staff and fellow inmates. The association with Combs has exacerbated Plaintiff's distress under the following circumstances:

- **Verbal Harassment by Correctional Officers:** Correctional officers have made disparaging and derogatory remarks, falsely accusing Plaintiff of being connected to Sean Combs in demeaning and abusive ways. Officers have mockingly suggested that Plaintiff is involved in Combs' alleged sex trafficking activities, telling other inmates that Plaintiff is one of Sean Combs' "sex workers" and falsely alleging that Plaintiff has been subjected to humiliating treatment by Combs.

- **Impact on Mental Health:** The harassment and degradation have exacerbated Plaintiff's emotional distress, impacting Plaintiff's mental health and well-being while incarcerated. Plaintiff has been subjected to ongoing verbal harassment and social alienation as a direct result of Defendant Combs' actions and the negative publicity surrounding his conduct. Mental health records may be presented as evidence to substantiate the emotional impact and damages incurred. (See Exhibit 11)

**BBE's Role in the Infringing Conduct**

19. Defendant BBE, through its attorney Pamela Gurley, directly acknowledged Plaintiff's ownership of the "ACT BAD" trademarks during contractual discussions. BBE actively participated in the planning, promotion, and sale of merchandise bearing the "ACT BAD" mark, tying the corporate entity directly to the infringing activities. (See Exhibit 2)

20. BBE's role extended to marketing campaigns, product distribution, and the commercialization of "ACT BAD" branded merchandise, all of which occurred without Plaintiff's consent and to Plaintiff's detriment.

**Legal Basis for Trademark Infringement**

21. The plaintiff's trademark "Act Bad Entertainment" covers clothing, and the inclusion of the word "entertainment" does not diminish the protection afforded to the "Act Bad" mark. Courts have consistently held that the dominant portion of a trademark is the most significant for determining the likelihood of confusion. The dominant portion of "Act Bad Entertainment " is "Act Bad," and therefore, the defendant's use of "Act Bad" on clothing infringes upon the plaintiff's rights.

**Relevant Case Law Supporting Plaintiff's Claims**

22. Case law supports Plaintiff's position:

- *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565 (Fed. Cir. 1983): The court emphasized the importance of the dominant portion of a mark in determining consumer association.

- *In re Dixie Restaurants, Inc.*, 105 F.3d 1405 (Fed. Cir. 1997): The court held that "Dixie" was the dominant portion of a mark and critical in establishing likelihood of confusion.

- *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874 (Fed. Cir. 1992): The court found that "Century" was the dominant portion of the marks, which caused confusion.

**Trademark Infringement**

23. To successfully allege a trademark infringement claim, a plaintiff must establish that:
24. They have a valid mark that is entitled to protection under the Lanham Act.
25. The defendant used the mark.
26. The use was in commerce.
27. The use was in connection with the sale or advertising of goods or services.
28. The use was without the plaintiff's consent.
29. Once the plaintiff has proven ownership of the trademark and that the defendant has infringed on those exclusive rights, the defendant is liable for infringement and liability is absolute. See 15 U.S.C. § 1114; 17 U.S.C. § 501.
30. Defendants' actions, including the sale of "ACT BAD" t-shirts on Sean Combs' website, directly violate these provisions. The unauthorized sale and marketing of merchandise using Plaintiff's trademarks demonstrate willful and bad-faith infringement.
31. Plaintiff has provided sufficient evidence to establish these elements, including examples of consumer confusion and Defendants' deliberate and willful use of the "ACT BAD" marks.

32. Defendants' actions constitute trademark counterfeiting under 15 U.S.C. § 1114 and are subject to liability under 15 U.S.C. § 1117.

**Defendant's Liability**

33. Sean Combs was personally and vicariously liable for promoting, selling, and profiting off of "ACT BAD" merchandise and profiting off of net profits for the recorded song without Plaintiff's permission. To prevail on a trademark infringement and unfair competition claim under the Lanham Act, Plaintiff must prove that Defendant's use of the allegedly infringing mark would likely cause confusion regarding the origin or sponsorship of Defendant's goods with Plaintiff's goods under Lanham Act § 32(1), 43(a), 15 U.S.C. §§ 1114(1), 1125(a).

**Determining Likelihood of Confusion**

34. In determining whether there is a likelihood of confusion, the following eight factors are considered:

35. Strength of the trademark.

36. Similarity of the marks.

37. Proximity of the products and competitors with one another.

38. Evidence that the senior user may bridge the gap by developing the product for sale and marketing of the alleged infringer's product.

39. Evidence of actual consumer confusion.

40. Evidence that the infringer adopted the mark in bad faith.

41. Respective quality of the products.

42. Sophistication of the market. Lanham Act § 32(1), 43(a), 15 U.S.C. §§ 1114(1), 1125(a).

**Registered Trademarks**

43. Plaintiff is the owner of the exclusive rights to the registered trademarks indexed as Exhibit 9 . All trademark registrations are in full force and effect.

44. Defendant's use of Plaintiff's registered trademarks is identical to or substantially indistinguishable from Plaintiff's registered trademarks. Accordingly, Defendant has engaged in trademark counterfeiting in violation of 15 U.S.C. § 1114.

45. Defendant's use of Plaintiff's registered trademarks without Plaintiff's consent constitutes trademark infringement in violation of 15 U.S.C. § 1114, in that, among other things, such use is likely to cause confusion, deception, and mistake among the consuming public and trade as to the source, approval, or sponsorship of Defendant's advertising, marketing, promoting, producing, offering for sale, and selling of the ACT BAD T-shirts with the "ACT BAD" mark bearing counterfeits and infringements of Plaintiff's registered trademark.

**Infringing Conduct**

46. Sean Combs engaged in infringing conduct, marketing, distributing, and offering to sell or selling materially different products in the United States. The products included an inferior material product, as described above. Consumers who purchase products with the "ACT BAD" logo from Defendant believe that they are purchasing a product sourced by Plaintiff. However, these products were sourced through a third party who sold an inferior material, leading to consumer complaints.

47. Defendant Sean Combs engaged in such infringing conduct with knowledge that the materially different products were not authorized for sale in the United States by Plaintiff. Furthermore, the materially different products were materially inferior to those authorized by Plaintiff for sale in the United States. Accordingly, Defendant's infringing conduct was knowing, willful, and intentional, and makes this case exceptional under 15 U.S.C. § 1117.

**Count I: Trademark Infringement under 15 U.S.C. § 1114**

48. Plaintiff owns two valid trademarks: "ACT BAD ENTERTAINMENT" and "ACT BAD," which are entitled to protection under the Lanham Act.

49. Defendant Sean Combs knowingly and without Plaintiff's consent used Plaintiff's registered trademarks in commerce, including the promotion, sale of merchandise, and public performance of the song "ACT BAD."

50. Defendant's unauthorized use of the "ACT BAD ENTERTAINMENT" and "ACT BAD" trademarks is likely to cause confusion, mistake, or deception among consumers as to the source, affiliation, or sponsorship of the goods and services offered under these marks, in violation of the Lanham Act.

51. In *Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133 (2d Cir. 1999), the court emphasized that likelihood of confusion can exist even when the marks are not identical. Here, the use of "Act Bad" by Defendant Sean Combs is sufficiently similar to Plaintiff's "ACT BAD ENTERTAINMENT" and "ACT BAD" to cause confusion.

---

**Count I (Cont'd): The Protection of "ACT BAD ENTERTAINMENT"**

52. Plaintiff owns both the trademarks "ACT BAD ENTERTAINMENT" and "ACT BAD." The fact that the word "Entertainment" is added to the latter does not negate or significantly alter the core of the trademark, "ACT BAD," which remains dominant and distinctive.

53. In *In re Mighty Leaf Tea*, 601 F.3d 1342 (Fed. Cir. 2010), the court held that adding generic or descriptive terms to a trademark does not necessarily create a distinct commercial impression. The dominant portion of the trademark remains the key focus for determining infringement. Here, the addition of "Entertainment" does not alter the distinctiveness or enforceability of "ACT BAD."

54. Similarly, in *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000), the court found that minor variations in a trademark, such as the addition of descriptive terms, do not avoid liability for trademark infringement if the core of the mark remains similar and is likely to cause confusion. In this case, both "ACT BAD ENTERTAINMENT" and "ACT BAD" are sufficiently similar that consumers would associate both with the same source.

55. Furthermore, in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999), the court ruled that adding a generic term such as "Entertainment" to a well-known mark does not significantly distinguish it from the original mark. Here, the inclusion of "Entertainment" is merely descriptive and does not detract from the fact that the dominant portion, "ACT BAD," remains protected.

56. Plaintiff's rights to both trademarks are further supported by *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000), where the court found that small changes to a trademark do not avoid infringement if the overall commercial impression of the marks remains the same. The dominant portion, "ACT BAD," continues to form the primary impression in both trademarks and therefore retains its full protection under the Lanham Act.

57. Plaintiff's rights to both trademarks are further supported by *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000), where the court found that small changes to a trademark do not avoid infringement if the overall commercial impression of the marks remains the same. The dominant portion, "ACT BAD," continues to form the primary impression in both trademarks and therefore retains its full protection under the Lanham Act.

58. Thus, Plaintiff's trademark rights in "ACT BAD ENTERTAINMENT" are not diminished by the addition of "Entertainment," and any use of the "ACT BAD" mark, even if it appears as "ACT BAD ENTERTAINMENT," infringes upon Plaintiff's trademark rights.

## Count IV: Breach of Contract under New York Law

59. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 33.

60. Although no signed contract was executed by Plaintiff due to his incarceration and Defendants' failure to respond to proposed revisions, Defendants acted as if the contract was valid by performing its terms, including using Plaintiff's "ACT BAD" trademark to market and sell merchandise and generate revenue from public performances.

61. Under *Miller v. Schloss*, 218 N.Y. 400, 407 (1916), and similar cases, an implied contract can arise from the conduct of the parties even without formal signatures.

62. Defendants' unauthorized actions demonstrate a breach of the proposed contract terms, which required mutual assent and specific authorization from Plaintiff.

63. Plaintiff has suffered financial harm as a result of Defendants' breach, including lost profits, reputational damage, and mitigation expenses.

## Count V: Unjust Enrichment

64. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 38.

65. Defendants profited from their unauthorized use of the "ACT BAD" trademark, benefiting at Plaintiff's expense and without providing compensation or obtaining proper authorization.

66. Under *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012), Defendants' actions constitute unjust enrichment as they reaped financial benefits while depriving Plaintiff of rightful profits and goodwill associated with the trademark.

67. It would be inequitable to allow Defendants to retain these profits without compensating Plaintiff for the harm caused.

## Count VI: Conversion

68. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 42.

69. Defendants exercised unauthorized control over Plaintiff's intellectual property, including the "ACT BAD" trademark, by selling merchandise and using the trademark for promotional purposes.

70. Under *Vigilant Ins. Co. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995), Defendants' actions constitute conversion, as they intentionally interfered with Plaintiff's property rights without authorization.

71. Plaintiff has suffered financial harm and reputational damage as a direct result of Defendants' unlawful appropriation of the "ACT BAD" trademark.

---

**Count VII: Voidable Contracts under Principal and Agent Doctrine (New York Law)**

72. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 46.

73. Under New York law, a contract entered into through an agent for both parties is voidable at the option of either party where the parties have no knowledge of the dual agency, and the agent has a discretionary role.

74. Defendants' failure to finalize the contract with Plaintiff's consent, while continuing to act as if the contract was valid, renders the purported agreement voidable under the principal-agent doctrine.

---

**Count VIII: Void Contracts under the Statute of Frauds (New York Law)**

75. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 49.

76. Under the New York Statute of Frauds, any agreement concerning the transfer of intellectual property or that cannot be performed within one year must be in writing and signed by the parties to be enforceable.

77. Defendants' failure to secure Plaintiff's consent and signature renders the purported contract void under the Statute of Frauds.

---

**Count IX: Trademark Infringement and Counterfeiting under the Lanham Act**

78. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 52.

79. Defendants' unauthorized use of the "ACT BAD" trademark constitutes trademark infringement under 15 U.S.C. § 1114 and counterfeiting under 15 U.S.C. § 1116(d).

80. Defendants' actions are likely to cause consumer confusion as to the source, affiliation, or sponsorship of the merchandise and promotional activities.

81. Under 15 U.S.C. § 1117(c), Plaintiff is entitled to statutory damages of up to $2,000,000 per counterfeit item for willful infringement.

82. Plaintiff seeks damages for the unauthorized sale of at least 100,000 counterfeit items bearing the "ACT BAD" trademark.

**Count II: Unfair Competition under 15 U.S.C. § 1125(a)**

83. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 26.

84. Defendant Sean Combs engaged in unfair competition by misrepresenting his affiliation with Plaintiff's "ACT BAD ENTERTAINMENT" and "ACT BAD" trademarks and using them in a manner that caused confusion among the public.

85. The negative publicity surrounding Defendant Sean Combs' misconduct has led to consumer reluctance to associate with or purchase merchandise bearing the "ACT BAD" mark, further damaging Plaintiff's business and reputation.

86. This negative association has diluted the distinctiveness of Plaintiff's trademarks, aligning with the principles in *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009), which recognized that unauthorized use of a mark can cause harm to its distinctiveness.

## Count III: Trademark Dilution under 15 U.S.C. § 1125(c)

87. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 30.

88. Plaintiff's trademarks "ACT BAD ENTERTAINMENT" and "ACT BAD" are well known in their respective markets, and their association with Defendant Sean Combs, especially in light of the negative publicity surrounding the Cassie Ventura case, has diluted the reputation and value of Plaintiff's marks.

89. Defendant's misconduct has caused consumers to avoid purchasing products under the "ACT BAD" brand due to its association with Defendant's scandal, which has caused long-term harm to the value of Plaintiff's trademarks.

## DAMAGES

- **Implied Agreement or Partial Performance**: $10 million for Defendants' actions suggesting partial performance of the contract, including unauthorized sales of merchandise and use of the *ACT BAD* trademark.
- **Emotional and Reputational Harm**: $25 million for severe emotional trauma and reputational harm caused by Defendants' actions, including public association with Defendant Sean Combs and harassment during incarceration.
- **Punitive Damages**: $30 million to address Defendants' willful and bad-faith infringement and misconduct.
- **Statutory Damages**: $5 million based on the sale of counterfeit items under 15 U.S.C. § 1117(c).
- **Trademark Infringement (Lanham Act)**:
  - **$25 million** for Defendants' willful and unauthorized use of the *ACT BAD* trademark, including:
    - Loss of control over Plaintiff's intellectual property rights.
    - Consumer confusion caused by Defendants' use of the trademark, which diluted its value and harmed its distinctiveness.
    - Lost sales, revenue, and licensing opportunities resulting directly from Defendants' infringement.
- **Total Damages Requested**: $100 million.

**Notable Cases Illustrating Significant Damages:**

**Tiffany & Co. v. Costco Wholesale Corp.**: In this case, Costco was found liable for trademark infringement and counterfeiting for selling diamond rings labeled as "Tiffany." The court awarded Tiffany $21 million, which included Costco's profits and punitive damages.

**OMG Girlz v. MGA Entertainment Inc.**: A federal jury awarded the musical group OMG Girlz $71.5 million after determining that MGA's "L.O.L. Surprise! O.M.G." dolls infringed on the group's name and likeness. The damages comprised $17.9 million in actual damages and $53.6 million in punitive damages.

---

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

1. A declaratory judgment that Defendants' actions constitute trademark infringement, unfair competition, and trademark dilution under the Lanham Act;

2. An order enjoining Defendants from further use of Plaintiff's trademarks;

3. An award of damages, including compensatory, statutory, and punitive damages, in an amount to be determined at trial;

4. An accounting of all profits derived from Defendants' unauthorized use of Plaintiff's trademarks;

5. Costs of this action, including reasonable attorney's fees; and

6. Such other relief as the Court deems just and proper.

---

Respectfully Submitted by,

*Charles Kenyatta Jr*
Charles Kenyatta Jr 22B3002
Collins Correctional Facility
PO Box 340
Collins, NY 14034